FERUSSAC and wife *vs.* THORN and wife.

Where a bill is filed to enforce the performance of a written contract, and the defendant sets up the defence that the contract sought to be enforced is different from that agreed upon between the parties, he must, in order to sustain that defence, show that the spurious was substituted for the real contract, through mistake, or fraud.

After a final decree has been regularly entered, against a defendant, by default, for want of an answer, the court will not set the same aside, as a matter of course, merely upon the defendant's ·presenting a sworn answer, setting up a defence to the suit.

The defendant must show that there is a probability that if the decree is opened he will be able to establish his defence, by proof. And if the court is satisfied, from the answer itself, that it is impossible for the defendant to prove the circumstances relied upon in his defence, by any competent testimony, it will not disturb the decree.

IN EQUITY.    The daughter of the defendants was married to the plaintiff, the Baron de Ferussac, in Paris, on the 26th of August, 1845.    Prior to the solemnization of the marriage, an antenuptial contract was entered into, whereby the defendants settled on the plaintiffs 20,000 francs a year, payable quarterly in advance from the day of the marriage.    And it was agreed that a legacy of £5000 sterling, which was payable to the daughter on her attaining the age of 21, should be a part of the marriage portion; and after its payment to the baron, an interest thereon at the rate of 7 per cent a year should be deducted from the 20,000 francs, and the balance only be thenceforth paid, with a covenant that that balance should be at least 12,000 francs a year.    The legacy of £5000 had been deposited in the Life and Trust Company, for accumulation.    In February, 1846, Madame Ferussac became of age, and all the parties had then returned to this country.    The first quarter of the annuity, 5000 francs, was paid on the day of the marriage, and the second quarter in November following, after the arrival of the parties in America.    After Madame Ferussac had attained the age of 21, the defendants refused to make any

Ferussac *v.* Thorn.

more payments, and notified the Life and Trust Company not to pay over the legacy, and refused to secure the annuity by mortgage on their property in New-York as had been stipulated in the antenuptial contract.

The plaintiffs filed their bill, making the Life and Trust Company parties, to compel a specific performance of the contract, and the payment over to them of the £5000 and its accumulations.

On an order of reference to a master, a commission was executed in Paris, and the depositions of the notary who drew and witnessed the contract, and of others who were present at the time of its execution, were taken, to be read on that reference. Upon the coming in of the master's report, an order was entered, directing the £5000 to be paid to the plaintiffs, which was accordingly done.

The bill of complaint was served on the 24th of September, 1846, and the time to answer was extended, at various times, by consent; and with a mutual understanding that no default should be taken without timely notice to put in an answer. The object of the delay being to effect a settlement, the answer of the defendants was drawn up and submitted to the inspection of the other party. On the 25th of May, 1847, the solicitor for the plaintiffs wrote to the solicitor for the defendants that every effort to arrange the controversy having failed, he would be required to put in the answer on the following day. The answer not being put in, on the 3d of June the bill was taken as confessed. A motion was now made to set aside the default, and to let the defendants in, to answer.

The answer, and the depositions taken in Paris, were among the papers used on this motion.

The defence set up was that the agreement between Mr. Thorn and the Baron de Ferussac, was that the legacy of £5000, and the annuity, should be settled on Madame Ferussac to her separate use, while the contract as executed subjected the property to " the rules of the *communanté* with all its consequences, and especially the administration of the property of the wife by the husband; which gave to the husband the right

to receive the principal, but the wife or her heirs to have the right, on the dissolution of the *communanté*, to take back all that had belonged to her."

*Murray Hoffman*, for the defendants, insisted that there were two particulars in which the contract, as executed, differed from the agreement of the parties; viz. as to the legacy, and as to the annuity. That to deny this motion would be to decide the merits of the controversy in this form. He cited *Wells* v. *Cruger*, (5 *Paige*, 164;) 2 *Story's Eq.* § 770.

*E. Sandford*, for the plaintiffs. 1. The defence set up has already been adjudicated upon. An application to open this default having been made to the chancellor, and denied by him, upon the merits, it cannot be renewed in this court. (*Voorhees* v. *Bank of the United States*, 10 *Peters*, 449. *La Guen* v. *Governeur*, 1 *John. Ca.* 437.) 2. There is no defence in fact which could be made out by proof, if the default were opened.

EDMONDS, J. A final decree having been entered, on the bill taken as confessed in this suit, the case is precisely within the rule laid down in *Wells* v. *Cruger*, (5 *Paige*, 164;) and the answer of the defendants was required to be exhibited in order that I might be satisfied as to the nature of the defence, and the sufficiency of the answer.

The nature of the defence is that the contract sought to be enforced is different from that agreed upon between the parties in the first instance. To make that available, it must also appear that the spurious was substituted for the real contract, through mistake or fraud. There are then two elements necessary to this defence; and if either fails, the defence is unavailing. To make out the latter element, the defendants set up that the contract was written in a foreign language, with which it is true they were familiar, so far as respects its use in common conversation, but not familiar with the technical terms used : that it was read to them hurriedly, and when on the eve of the marriage, so that their attention was not drawn to the

particular language in which it was clothed: and that their signatures were "procured to it by misrepresentation *or* wilful concealment of the real contents, and it was executed by them under a mistake as to its contents, produced thereby."

The defendants invoke to their aid a memorandum in writing which they aver was drawn up, as a minute of their agreement for the instruction of the notary, and in which it was said that the annuity should be for the daughter's separate use and receipt, and the legacy should be invested in her separate or individual name. They also aver that this agreement was varied in these respects; that the annuity should continue only during the lifetime of the father, and not during that of the daughter, and that the defendant, in lieu thereof, should agree by his will to leave to her an equal share of his estate with his other children. And that the proposition to secure the annuity by a *mortgage on defendant's property in the United States,* was declined by him, and withdrawn. According, then, to the answer, the agreement was that the legacy should be secured to the daughter's separate use—that the annuity should be paid to her separate use, and continue only during the lifetime of her father, and not be secured except by the promise contained in the contract. And yet the contract which was executed, in language remarkably perspicuous and exempt from technicalities, provides quite otherwise. Article 1, of the contract, is entitled " Community," and provides that " the intended married couple adopt as the regulation of their marriage the rules of the community of property as it is established by the civil code, with the modifications hereinafter described." Art. 2, entitled "Exclusion of the movables present and future," declares that the movables of the married couple are entirely independent of the community. Art. 4, is entitled " Contribution of the intended husband." Art. 5, entitled " Contribution of the intended wife," declares that she brings into the marriage, 1st, her movables, &c. valued at 20,000 fr.; 2d, the legacy of £5000, " of which contribution the husband had notice, and consented to be charged therewith, viz. : with the movables, &c., from the fact of the marriage, and with the

legacy, " as soon as he shall have reduced the same into his possession." Art. 6, entitled " Appointment of marriage portion by Mr. and Mrs. Thorn," declares that they give their daughter, as a marriage portion—which is to be an advance on her inheritance—" a yearly and perpetual income of 20,000 fr., being the interest, at 7 per cent, of 285,715 fr." and then provides, " in order to secure to the intended married couple both the use and the payment, if it should be necessary, of the income of 20,000 fr., Mr. and Mrs. T. bind themselves jointly and severally to give a good and sufficient mortgage on the real estate belonging to one of them, situated in the United States, to the amount of the principal sum of 285,715 fr." &c. The contract then provides for the dissolution of the community—that if the capital out of which the annuity flows shall be paid in, Mr. and Mrs. T., or the daughter's heirs, may retake it, within a period therein specified—and in case of the daughter's death, before the capital is paid in, M. de Ferussac shall receive the annuity of 12,000 fr. for two years after her death. " Mr. and Mrs. T. and the intended wife make a gift to the future husband, who accepts it, but only in case of his surviving his intended wife, of the said income of 12,000 fr., which Mr. and Mrs. T. bind themselves in that case to pay to the intended husband during the two years which shall follow the decease of the future wife."

The contract that was executed being thus so essentially different from that set up by the defendants, the nature of the task which they seek to assume in interposing their defence, may be estimated. By what testimony is it to be sustained? Not by M. de Ferussac, for this is not an application for leave to file a cross-bill by way of a discovery from him. Not by the notary, for he has already testified, and has given a very different relation of the transaction. By any one of the persons who were present at the execution of the contract? Those residing in Paris have already been examined, and do not sustain the defence. On the other hand, they, or some of them, say, that at the time of the execution, the contract was read by the notary, not hastily, but in a loud and distinct tone of voice,

that Mr. T. followed the reading, on a copy of it which he held in his hand, and which had been for several days in his possession; that he made no objection to any of its provisions: that it conformed very closely to the antenuptial contract of his other daughter : that two or three days before the marriage, the notary had waited upon Mr. T. at his house, and had read over to him the draft, the contents of which he was already aware of, and in answer to his questions had stated to him, among other things, " that at all times the intended husband shall have a right to receive the capital sums which shall be paid to his wife, and especially the £5000, and to employ it in such manner as he shall think fit, but as soon as he shall have received them he shall become a debtor therefor to his wife," &c.

Under such circumstances, to get rid of a final decree, the defendants must do something more than merely present a sworn answer. They must show that there is a probability that they will be able to establish their defence : otherwise opening the decree would be merely leading to protracted and unavailing litigation, with no prospect of changing the result.

These considerations have the more force with me from these circumstances : 1. That the defendants in their answer say that " their signatures to the contract were procured by misrepresentation *or* wilful concealment." Do they not yet know which ? Are they not only destitute of proof, to establish that, but even wanting in evidence enough to bring their own minds to a conclusion ? Then indeed would farther litigation be unavailing. 2. Throughout the whole proceedings the defendants have held out the idea that the contract was executed under circumstances of haste and excitement, which precluded a deliberate consideration and consequent knowledge of its contents. Before the answer, which they seek to put in, was sworn to, the deposition of the notary had been received in this country, and its contents had come to their knowledge; yet the answer takes no notice of the facts stated by the notary, that he had had one or two interviews with Mr. T. in regard to the contract, had read the draft to him, and had explained to him that

its effect and operation would be precisely such as the defendants now complain of. If those statements are true, there is an end to this defence; and it could hardly be right to admit an answer which maintains a studied silence in regard to them.

Under these circumstances, until such allegations shall be met in some form, and until the court can be satisfied that there is some probability of making out the defence against the strong countervailing evidence before me, I cannot feel warranted in opening the decree.